867 So.2d 427 (2004)
Stephen J. SCIPIO, Appellant,
v.
STATE of Florida, Appellee.
No. 5D02-2240.
District Court of Appeal of Florida, Fifth District.
January 23, 2004.
Rehearing Denied March 18, 2004.
*428 James B. Gibson, Public Defender, and Noel A. Pelella, Assistant Public Defender, Daytona Beach, and Larry B. Henderson, Assistant Public Defender, Holly Hill, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Carmen F. Corrente, Assistant Attorney General, Daytona Beach, for Appellee.
SHARP, W., J.
Scipio appeals from a final judgment and sentence after a jury convicted him of first degree murder. He was found guilty of shooting twenty-eight year-old Ogard Smith, in the early morning hours of January 21, 2001. The court sentenced Scipio to life imprisonment, without possibility of parole. Scipio raises several points on appeal. However, only onethat the state committed a discovery violationhas any merit. Because there is no reasonable possibility that the discovery violation prejudiced defense, we affirm.
At Scipio's trial, four witnesses identified him as Smith's assailant, but there was no physical evidence connecting Scipio to the crime. Smith was shot four times, and two projectiles were recovered from his body. They were possibly fired from the same pistol, most likely a revolver, but the gun was never recovered.
The testimony adduced at trial was that immediately prior to his death, Smith was shooting pool with Miles Garey in the pool room of the Southside Inn, a Daytona Beach nightclub, which is located in a high crime area. Garey testified that he and Smith had been at the Southside Inn only a short while, and that he was bending over shooting pool, when he heard Smith say "Oh, s-t, he's got a gun." Garey felt a bullet whiz by his ear and he ran outside the bar. Garey could not identify the shooter.
When police arrived, Smith was lying in the parking lot and bystanders were trying to help him. Smith was pronounced dead at the scene. Although police questioned potential witnesses at that time, no one claimed to have seen what happened. Scipio was not questioned by police because he was not in the area. However, three people (Harper, White and Gaines) subsequently gave police information about the crime, and testified at Scipio's trial that they saw him shoot Smith. A fourth witness testified that Scipio admitted shooting Smith to him.
The state's theory of the case was that Smith's murder was in retaliation for his testimony against an individual named Robert Allen. Smith had been the victim of a robbery perpetrated by Allen about a year earlier. Allen had been convicted of the robbery and sentenced to fifteen years imprisonment, based in part on Smith's testimony.
Four days after the shooting, police stopped and questioned Harper. He told police that Scipio shot Smith after he and *429 Gaines had a conversation at the Southside Inn to the effect that Smith should not be there because he had testified against Allen. Harper said that Smith had been previously "jumped on" because of his testimony in the Allen case, and that they didn't want him at the Southside Inn. Scipio left the bar, saying he would be "right back." Scipio returned with a gun.
He came into the bar room area, stopped and looked around. Then he walked into the pool room. Harper heard a sound like a firecracker, and a lot of people started running. Smith began crawling out of the bar and Harper saw Scipio following behind Smith, "telling him that he don't care if he die, fk him, he got my homeboy 15 years, he shouldn't have came down here." Scipio followed Smith all the way outside the bar, shooting at him until bystanders intervened.
The second eyewitness was White. She testified that on the night of the murder, she was at the Southside Inn drinking and dancing. At one point, she heard a loud commotion, and then saw Scipio walk in and heard him in the opposite room make statements like "I oughta burn this fking n___r dog." He walked into the room she was in and he continued to make similar statements. White said Scipio was "real hyped up." She kept her eye on him after that so that if anything happened, she could get out of the way. At some point Scipio left, but she later saw him return. Scipio walked past her, bumping her into the bar and when she turned around, she saw him start to shoot. She panicked, but ran when her cousin grabbed her hand.
The third eye-witness was Gaines who saw Scipio arguing with Allen's brother, Earl. Earl was trying to keep Scipio from getting a gun. But Scipio left and came back with a gun about twenty minutes later. Gaines saw him walk toward the area where the pool tables were located, and shoot into the pool room. Scipio then shot and kicked the man who was crawling on the ground. Gaines said Scipio shot the man as he crawled outside the bar.
The fourth witness, Hogan, was not at the Southside Inn at the time Smith was shot, but lived nearby. After Smith's death, Hogan provided information about the shooting to police. At trial, he said that on the evening of the shooting, Scipio came to his home after midnight. Scipio seemed intoxicated and stated that he had just killed a man at the Southside Inn, because the man had testified against his "homeboy." Hogan also saw the butt of a gun protruding from Scipio's coat.
Scipio's defense was that another person had committed the crime. The defense intended to rely, in part, on the testimony of Robert Burch, an investigator for the Medical Examiner's Office. During Burch's deposition, defense showed him a photograph of the crime scene outside the Inn, in the parking lot. Based upon this photograph, Burch said there had been a semi-automatic pistol under Smith's body, and that he had turned it over to law enforcement. Defense believed that this evidence could have created doubt in the mind of the jury as to whether Scipio was the assailant.
Defense counsel met with Burch on the morning of the trial and asked him to review his deposition testimony. Burch did so and said he agreed with it. However, Burch was subsequently approached by the prosecutor and asked about the weapon. Burch told the prosecutor he thought there was a photograph of a weapon.
The prosecutor brought Burch to the State Attorney's Office to review the photographs. Defense asked to accompany them but the prosecutor refused. The prosecutor produced the crime scene photos. *430 When Burch reviewed them, he decided the FDLE photo showed the object he had believed to be a weapon, was in fact a pager. Burch realized that he had been mistaken in his deposition testimony, but this information was not given to defense prior to the commencement of the trial.
When Burch testified at trial that he had not seen a gun at the scene, but rather he had seen only a pager, the defense was completely surprised. Defense counsel made a motion for a mistrial based on Burch's changed testimony, but it was denied. The defense was permitted to impeach Burch, but Burch stuck to his story, explaining that he had made a mistake.
The failure to disclose a significant change in a witness's testimony is as much a discovery violation as a complete failure to disclose a witness. State v. Evans, 770 So.2d 1174, 1182 (Fla.2000). The state had an obligation to inform the defense, prior to Burch taking the stand, of his changed testimony, pursuant to Florida Rule of Criminal Procedure 3.220(j), which imposes a continuing duty to disclose information counsel obtains after its initial discovery obligation has been met. Whites v. State, 730 So.2d 762 (Fla. 5th DCA 1999).
Instead, the state actively procured the defense witness's recantation of his earlier deposition testimony, knowing that defense counsel intended to rely on that deposition. The recantation was obtained minutes before the trial and defense counsel was expressly excluded from the state's interview with the witness. Nor was the defense informed of Burch's recantation or permitted to question him, prior to the trial. Thus, defense was completely surprised by Burch's trial testimony.
Based on these facts, we find that the state committed a discovery violation because it failed to advise the defense of the changed testimony prior to the commencement of the trial. See Rule 3.220(j); Whites. The purpose of the discovery rules is to facilitate a truthful fact-finding process, and to prevent surprise by either side. Evans. Non-disclosure of changed testimony is tantamount to the failure to name a witness at all. Evans. The type of "dirty pool" that occurred in this case is exactly the type of conduct the discovery rules were designed to prevent.
Having found that a discovery violation occurred, we must next determine whether the violation was harmful, requiring a reversal. A violation is harmful if the defense is procedurally prejudiced. Pender v. State, 700 So.2d 664, 666 (Fla. 1997); State v. Schopp, 653 So.2d 1016 (Fla.1995). The defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Pender; Schopp. Trial preparation or strategy will be materially different if it reasonably could have benefitted the defendant. Id. If the reviewing court finds that there is a reasonable possibility that the discovery violation prejudiced the defense, the error must be considered harmful. Id. Put another way, if the appellate court can say, beyond a reasonable doubt, that defense was not procedurally prejudiced by the discovery violation, then the error is harmless. Id.
As noted in Pender and Schopp, this question turns on whether the discovery error (here failure to inform the defense of the recantation on the day of the trial of a defense witness' testimony given earlier at deposition), materially hindered Scipio's trial preparation or strategy. We think it had no such effect. The defense in this case was deprived of possibly being able to establish the existence of an alternative shooter in the parking lot, based on a mistake.
*431 Had the defense known about the witness' change in his testimony, its trial strategy could only have been one of two things. One, it would not have called the witness. Clearly the outcome of this case would not have been affected given the multiple eyewitness testimonies concerning Scipio's shooting Smith inside the Inn. Or second, the defense would have called the witness and sought to impeach him, to present the jury with his prior testimony. That is, in effect, what happened in this case, which if anything, was more favorable to Scipio than not having called the witness.
Although we conclude there was no reasonable doubt that the defense was not procedurally prejudiced by the discovery violating in this case, we warn prosecutors against failing to comply with the Florida Criminal Discovery Rules. They are intended to prevent surprise by either side. In a different case where the evidence is less overwhelming, or a recanting witness more material, we would be compelled to reverse for a new trial.
AFFIRMED.
PETERSON and PLEUS, JJ., concur.