FARMER, J.
Defendant and a companion were arrested for burglary, handcuffed and left unattended in the rear seat of a police car. No one else was present, but a video monitor recorded them.
At trial the prosecution sought to admit excerpts of the recording. The state attorney contended that the companion could be understood as saying to defendant: “Damn, you think they caught us for the home invasion, home burglary?” and “Hey, we did not leave anything in there?” The prosecution argued that defendant’s lips seemed to be moving, that he appeared to say: “They’ve got it. They’ve got it.”[1]
Defendant objected, saying that he did not respond in any way to his companion. He argued that, because he had been just arrested and taken into custody, the admission of the tape showing his silence to any declarations by his companion would violate his right against self-incrimination. The court allowed the evidence, reasoning that defendant was not being interrogated by police at the time.
Later, defendant testified on his own behalf, denying involvement in the burglary. He testified that he did not say anything while seated in the police car. When asked on cross-examination why his mouth seemed to be moving as in speech, he denied that his lips were moving. He denied ever saying: “they’ve got it; they’ve got it.” He explained that he remained silent in the police vehicle in spite of his companion’s declarations because he was angry at being arrested. Then this inquiry by the prosecutor:
Q. Did you at any point say to him: ‘What are you talking about, what burglary?’
A. No, because I was mad that he got me arrested.
[[Image here]]
Q. How come you didn’t say: ‘What burglary are you talking about?’ How come you didn’t say that?
A. I don’t know what you’re talking about.
Q. How come you didn’t say — when he said ‘damn, you think they caught us?’ — why didn’t you say ‘I’m not part of it. What are you talking about? I was not with you.’
A. Because I didn’t even talk to him.
Q. Do you have a problem with your hearing?
A No.
*448 Over defendant’s objection the trial court allowed the line of questioning. The state then asked defendant: “At no point did you say to him, ‘Us, in a home invasion burglary? What are you talking about? I don’t know what you’re talking about?’” Again defense counsel objected without success.
In closing argument the prosecutor told the jury the following:
“What would be the reasonable reaction of a person who did everything perfectly legal? I got [certain goods stolen in a burglary] at the park. Why the police’s arresting me? What does he want from me? Co-defendant driver, McDonald, Mr. McDonald, damn, you think they caught us for the home invasion home burglary? How come he didn’t say robbery, shoplifting, punching somebody? Burglary. That’s exactly what happened in Mr. Neighbor’s house. Burglary.
“Defendant says — I asked him on cross examination, didn’t you hear the co-defendant say that?- — Yeah, I did. But I didn’t say anything. I just ignored him.... Wouldn’t a reasonable reaction, reasonable, not possible, not speculative, not all of that, the reasonable reaction of a normal person sitting, his buddy sitting next to him, the sole occupants of the car. They were sitting right next to each other. I wasn’t there. I didn’t burglarize nobody. I didn’t burglarize anybody. Why are you including me? What burglary? What are you talking about? No. Look at the video. That was not the reaction, the expression on the face, the expression on the face. Damn how are you going to get out of it now? Now we’re being caught. How are we going to get out of it? We’re caught for the burglary.
“Defendant never ... never denied that these words were uttered.... Wouldn’t the reasonable reaction of a normal person be, like, ‘who is we?’ ‘Who is us?’ T didn’t commit the burglary.’ T don’t know what you’re talking about.’ ‘What burglary?’
“When he took the stand he said T don’t know what you’re talking about.’ He never, ever said T have no idea why the police arrested me.’ T did nothing.’ T have no idea why they arrested me.’ ”
From a conviction, we have the appeal.
Defendant argues that the trial court violated his Florida right against self-incrimination when it admitted the recording and thereupon permitted the above cross-examination, allowing the prosecutor in closing argument repeatedly to emphasize defendant’s silence when the companion was said to have spoken to him in the police car. In particular defendant argues that in admitting the recording, the trial court allowed the prosecution to go beyond resolving any dispute as to whether defendant actually said anything in a conversation with the companion. He contends that the recording became the foundation for the State instead to question him about remaining silent and to argue that his silence was really evidence that he was guilty.
The record establishes that the prosecution’s sole justification in the trial court for the evidence and argument concerning silence was that he had waived his right against self-incrimination by participating in a conversation.[2] As to the cross-examination and argument about his failure to respond to the companion’s assertions, it simply argues that it was not at all commenting on silence but instead merely impeaching his direct testi *449 mony that he never responded to the companion’s declarations.
We agree that the video recording may have been admissible for a limited purpose of showing that defendant may have actually spoken to the companion during their vehicular confinement, that he might thereby have voluntarily said something incriminating. But we do not agree that any attempt at impeachment justified cross-examination about things he did not say and corresponding argument set forth above. In other words, we draw a distinction between evidence of voluntary incul-patory comments by a defendant under arrest, on the one hand, and defendant’s silence — the absence of speech — on the other. The comments would be admissible because declarations by an accused then could be deemed his own voluntary statements. The video record would therefore be admissible to show actual speech by defendant but not for any purpose involving an exercise in silence.
Post-arrest, custodial silence of the defendant is simply inadmissible as evidence of guilt and is not a proper subject of argument. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), concerned unexpected testimony at trial by defendants as to an exculpatory defense not stated before. The trial court allowed the prosecution to cross-examine them as to why they had not previously told the police or the prosecutor before trial about this defense. The Ohio prosecutor was also permitted to argue in closing that their pretrial silence as to the defense should be weighed against them. In holding all of this constitutionally impermissible, the Court made clear that “it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.” 426 U.S. at 618, 96 S.Ct. 2240. The Court explained:
“Despite the importance of cross-examination, we have concluded that the Miranda decision compels rejection of the State’s position. The warnings mandated by that case, as a prophylactic means of safeguarding Fifth Amendment rights, require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee’s exercise of these Miranda rights. Thus, every post-airest silence is insolubly ambiguous because of what the State is required to advise the person arrested. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.” [e.s., c.o.]
Id. at 617-18, 96 S.Ct. 2240. Hence, because of the constitutional right against self-incrimination, under Doyle “every post-arrest silence” should be deemed insolubly ambiguous as inculpatory evidence and, for that reason, unavailable as proof of guilt, [e.s.]
In this case, it does not appear that the Miranda warnings had yet been administered when defendant and his companion were left in the police vehicle. But that omission hardly weakens defendant’s right against self-incrimination in this State because Florida law does not require a prior incantation of a Miranda warning. The Florida Supreme Court has held that regardless of whether the federal Miranda warning has been given, the Florida right against self-incrimination attaches at the time of arrest. State v. Hoggins, 718 *450 So.2d 761, 768-69 (Fla.1998); Art. I, § 9, Fla. Const. (providing that an individual shall not “be compelled in any criminal matter to be a witness against himself’); see also Clark v. State, 363 So.2d 331, 333 (Fla.1978) (“Indisputably, evidence of post-arrest silence is improper because it violates the defendant’s right against self-incrimination.”); Hicks v. State, 590 So.2d 498 (Fla. 3d DCA 1991) (holding that as matter of state constitutional law, it is impermissible to comment on defendant’s post-arrest silence whether silence is induced by Miranda warnings or not). Therefore, defendant’s right against self incrimination attached at the instant of his arrest — even without Miranda warnings.
We see no significance in the fact that defendant’s silence was not a response to police interrogation. Neither was defendant’s silence in Hoggins a response to police interrogation, arising instead from accusations by the victim of the crime. Yet Hoggins emphasized that the state constitutional right against self-incrimination after arrest “extendfs] to all evidence and argument, including impeachment evidence and argument, that was fairly susceptible of being interpreted by the jury as a comment on silence.” [e.s.] 718 So.2d at 769.[3] Similarly, in Hosper v. State, 513 So.2d 234 (Fla. 3d DCA 1987)— cited with approval in Hoggins, 718 So.2d at 769 — the Third District held: “The prosecution is not permitted to comment upon a defendant’s failure to offer [e.s.] an exculpatory statement prior to trial, since this would amount to a comment upon the defendant’s right to remain silent.” 513 So.2d at 235; see also Weiss v. State, 341 So.2d 528 (Fla. 3d DCA 1977) (same holding as- regards questioning of defendant concerning his failure to give exculpatory explanation at any time prior to his trial testimony). The plain meaning of the phrase used in Hoggins — “all evidence and argument” — includes circumstances other than police interrogation. Hence, the Florida Constitutional right against self-incrimination does not require police interrogation to trigger its protection; it shields all post-arrest silence with or without police interrogation. The accused does not need any contextual element of police questioning to bar any use at trial of his post-arrest silence. Hoggins, 718 So.2d. at 771.
When evidence or argument is “fairly susceptible of being interpreted by the jury as a comment on silence,” it violates defendant’s right against self-inmmi-nation under Florida law. Hoggins, 718 So.2d at 769. This is true whether evidence of post-arrest silence is introduced in the state’s case-in-chief or instead for impeachment purposes. Id. As a consequence, “courts must prohibit all evidence or argument [e.s.] that is fairly susceptible of being interpreted by the jury as a comment on the right of silence.” State v. Smith, 573 So.2d 306, 317 (Fla.1990).
In State v. Kinchen, 490 So.2d 21 (Fla.1985), the supreme court was asked to abandon the “fairly susceptible” test in favor of a more elastic standard of review tolerating some comments about silence. In refusing to change the standard, the court said:
“Commenting on a defendant’s failure to testify is a serious error. The fairly susceptible test offers more protection to defendants than does the federal test, and we decline the state’s invitation to adopt the latter.”
*451 490 So.2d at 22. Justice Ehrlich further explained in his concurring opinion that: “The purpose of this drastic remedy is not to punish the prosecutor for misconduct, but to preserve to the individual the full measure of his constitutional right to remain silent.” 490 So.2d at 23. The full measure of the right against self-incrimination must necessarily embrace ah silence between arrest and trial. It is not limited merely to the right to stand mute at trial.
The issue is thus whether the cross-examination of defendant and closing argument in this case are “fairly susceptible of being interpreted by the jury as a comment on silence.” 718 So.2d at 769. The prosecution repeatedly asked defendant why he did not respond to the companion’s implied accusation. The State repeatedly argued that if truly he had not been involved in the burglary he would have responded with protestations of innocence. A jury could reasonably interpret this entire line of cross-examination and its related argument to imply some duty upon defendant to respond by contradiction. Therefore, the prosecution’s cross-examination and closing argument were “fairly susceptible” of being interpreted by the jury as a comment on defendant’s silence. The State has failed to demonstrate beyond a reasonable doubt that this error had no effect on the jury. Munroe v. State, 983 So.2d 637, 642-43 (Fla. 4th DCA 2008).

Reversed for new trial.

POLEN, J., concurs.
TAYLOR, J. concurs specially with opinion.

. But as to the parts sought to be admitted, the audio was "too garbled” for the court reporter to transcribe. At best they are unclear.

. The State did not argue any basis under the Evidence Code to admit the evidence.

. And so the State's justification here that it was merely impeaching defendant did not save its improper use of post-arrest silence.