WARNER, J.
 

 Brendan Rao appeals his conviction for first degree murder. He raises three issues on appeal, arguing that (1) the court erred in allowing a witness to testify that he was engaged in satanic worship in high school, where the evidence was inadmissible as showing only bad character; (2) the court erred by admitting gruesome pictures of the victim’s burned body which were highly prejudicial; and (3) fundamental error occurred in closing argument when the prosecutor commented on his right of silence. We affirm on all issues, finding that in context the court did not abuse its discretion in admitting the single reference to satanic worship. Alternatively, it was harmless beyond a reasonable doubt. Further, the pictures were properly admitted to explain the cause of death. Finally, the prosecutor made only one comment which could be considered a comment on silence, but it did not constitute fundamental error.
 

 On April 5, 2000, police received a call about smoke coming from a dumpster and upon investigation discovered the charred body of Matthew Collins inside the dumpster. An autopsy revealed that the victim’s death was not caused by the fire, but rather was caused by a combination of head trauma and strangulation. Ligatures were found around his neck. A few days later Detective Stone received a phone call from Christine Grace, who worked with the victim at a music store. As a result, police investigated the phone records of the victim, which showed that in the last hours of his life the victim had made sever
 
 *42
 
 al calls to the defendant, Brendan Rao. The police interviewed Rao and made further investigation, but no arrests were forthcoming at that time. After investigation, the case remained unsolved.
 

 In 2004 after the original investigator retired, Detective Curcio took over the Collins murder investigation. Curcio re-interviewed individuals involved in the initial investigation, including Mark Lichten-berg, a classmate of Rao’s, who was a suspect in the case. During their interview, Detective Curcio asked Liehtenberg to use the detective’s cell phone to call the home phone number of Brendan Rao. Rao didn’t answer. Instead, Liehtenberg left the detective’s phone number and a message saying who he was and asking him to call back. Two days later Rao actually called Curcio’s phone, and Curcio, portraying himself as Mark Liehtenberg, recorded the phone call. Acting as Li-chtenberg, Curcio told Rao that the police had re-interviewed him in reference to the murder. During the conversation, Rao appeared unaware that he was not talking to the real Liehtenberg. Rao denied having talked further to the police and cautioned Curcio not to talk to anyone. Rao told Curcio that the case was entirely circumstantial and as long as he kept out of trouble, no one would know, because “nobody was there.” Rao never directly referred to the murder or made any directly inculpatory statement but continued to repeat that Curcio (posing as Liehtenberg) should not say anything if interviewed. Rao also encouraged him to get out of town if necessary.
 

 Two months later, the police arrested Rao. During Curcio’s interview of Rao, Rao requested to contact his mother. Curcio left the interview room and allowed Rao to use his cell phone to call his mother. Rao’s conversations with his mother were recorded and played at trial. In them, Rao first explained that the police had arrested him and what would happen to him. He asked her to bring him some clothes and then told her what monies she could have of his, as he was supporting her. He told her that there was nothing for her to say because he had never spoken “about it” to his mother. The conversations went on for a considerable period of time.
 

 At trial, three witnesses testified that Rao had admitted the murder to them. Christine Grace testified that she worked with Collins, Liehtenberg and Rao at Mars Music store. Rao would talk to her and tell her about himself. Over objection, she was allowed to tell the jury that he had told her he was “into satanic worship” in high school, and that “he hadn’t done anything serious but liked to mess around with fire.” Rao told her that Collins had robbed Rao’s home, taking a pound of marijuana, Rao’s favorite guitar, and money. Rao claimed that Collins was the only one who knew where Rao kept his stash of marijuana and that Collins loved Rao’s guitar. Although Rao asked Grace not to tell anyone about what he had revealed, when she learned during a meeting at work a few months later that Collins had been missing for a week and heard that a body had been found in a dumpster, she called police and gave a statement.
 

 A second witness, Jacob Condell, knew Rao from high school. He testified that on April 25, 2000, he was at Rao’s home, and they smoked marijuana. Rao told Condell that a kid named Matt had stolen stuff from Rao’s house three times and that he had wound up dead. Rao also commented that “it was just something that had to be done.” Condell asked Rao what he did with the body, and Rao mentioned that he
 
 *43
 
 “touched the body”
 
 [1]
 
 and that his only mistake was not screwing up the dental records for identification purposes. Cold-well also gave a statement to the police.
 

 Finally, Candice Moreland testified that she met Rao in high school in 1995. They were close friends and had a sexual relationship. In the summer of 2000 Rao told her that he murdered someone. He told her a coworker of his had robbed his house not once, but twice. Rao, Lichtenberg (whom she also knew from school), and another male coerced the victim back to Rao’s cottage where he strangled him. Then they put his body in the trunk of a car, dumped it in a garbage bin, and set it on fire. Rao told Moreland that he had been the one to strangle Collins. More-land was impeached on her delay in reporting the crime to the police and her substantial drug use, including her intoxication at the time she first reported the crime to the police.
 

 Dr. Lisa Flannagan, the medical examiner, testified that the victim died prior to being burned. She could determine this based on the absence of soot in the victim’s internal airways and a negative carbon monoxide level in his blood. In addition to the strangulation she determined that there had been a blow to the head because of the hemorrhage she found between the membrane and the skull. In her testimony she used photos of the charred body to show the ligatures around the victim’s neck as well as to explain the hemorrhage. The photos were admitted over the defense objection, the court finding that they assisted the medical examiner in the explanation of the cause of death.
 

 The jury found Rao guilty of first degree murder. The court sentenced him to life in prison, and he appeals.
 

 Rao first contends that the trial court erred in allowing Grace to testify that Rao told her he was engaged in satanic worship in high school. He argues that the evidence did not tend to prove or disprove any material fact and was admitted simply to show bad character. The standard of review for admissibility of evidence is abuse of discretion.
 
 Nardone v. State,
 
 798 So.2d 870, 874 (Fla. 4th DCA 2001).
 

 Had the witness testified only that Rao was formerly engaged in satanic worship, we would agree that this evidence was irrelevant, tending only to prove bad character. However, here the evidence was tied to the additional, unobjected-to statement that Rao liked to “mess around with fire.” As the victim’s body was burned, the statement provided at least an inference that the use of fire was consistent with Rao’s past conduct.
 

 Even if the evidence was erroneously admitted, we would conclude that under the circumstances any error is harmless beyond a reasonable doubt.
 
 See State v. DiGuilio,
 
 491 So.2d 1129 (Fla.1986). Only one witness referred to Rao’s past, not present, interest in satanic worship. The state never mentioned it in its closing argument. No suggestion was made that satanic worship had anything to do with the crime. Three witnesses testified that Rao had admitted to committing the murder. We have no trouble in concluding that admitting this isolated reference did not affect the verdict.
 

 The second issue, involving admission of the photographs of the victim’s charred body, also does not merit reversal. The photographs were used by the medical examiner to explain the cause of death, strangulation and head trauma, as well as
 
 *44
 
 the circumstances of the death, as the photographs showed the ligatures around the victim’s neck. The circumstances are nearly identical to
 
 Jackson v. State,
 
 545 So.2d 260 (Fla.1989). There, the victims’ bodies were also burned. The adult victims died of gunshot wounds, while the child victims died of smoke inhalation. Our supreme court rejected a claim that the trial court erred in admitting photographs of the victims’ charred bodies, because “these photos were relevant to prove identity and the circumstances surrounding the murders and to corroborate the medical examiner’s testimony.”
 
 Id.
 
 at 265. The same can be said of the photographs admitted in this case. No error occurred.
 

 Finally, Rao claims that the prosecutor committed fundamental error in closing argument by making three comments implicating Rao’s right of silence. Two of these, however, occurred pre-arrest, and the prosecutor’s comments did not violate any constitutional right. As to the third comment, although it was error, it was not fundamental error.
 

 During the closing argument, the prosecutor discussed the phone call between Detective Curcio and Rao, where Curcio portrayed Lichtenberg. He asked the jury whether anyone would respond the way Rao did by telling him to keep his mouth shut. The prosecutor ended by saying: “I mean, wouldn’t you come right out, wouldn’t a common person, wouldn’t a person who had nothing to do with it say what the hell you talking about, what do you mean, I have no idea what you’re talking about, what, are you crazy?” Again referring to this conversation in rebuttal, the prosecutor maintained that Curcio got Rao to admit his involvement in the murder.
 

 The telephone conversation between Rao and Curcio, posing as Lichten-burg, occurred well prior to Rao’s arrest. Pre-arrest silence does not carry the same protection as post-arrest silence.
 
 See e.g. State v. Hoggins,
 
 718 So.2d 761, 770 (Fla.1998);
 
 White v. State,
 
 757 So.2d 542 (Fla. 4th DCA 2000) (pre-arrest silence can be used to impeach a defendant, as long as silence was inconsistent with defendant’s testimony at trial). Moreover, the prosecutor was not commenting on Rao’s silence but on what Rao actually said in the recorded conversation, i.e., his exhortation to Curcio (posing as Lichtenberg) not to talk, to get out of town, etc. The prosecutor’s comments were no more than a suggestion to the jury that Rao’s statements were not the comments of an innocent man.
 

 In
 
 Badillo v. State,
 
 822 So.2d 526 (Fla. 3d DCA 2002), the defendant claimed that it was error to allow a police detective to testify that in two interviews several months prior to the defendant’s arrest, the defendant never claimed self-defense as to the incident, which that was his present contention at trial. The court noted that “[ejxamination regarding the contents of pre-arrest interviews did not amount to a comment on silence.”
 
 Id.
 
 at 527. Similarly, in this case, the prosecutor’s remarks on the Curcio telephone call made months before the arrest were not comments on silence but were used to contradict Rao’s theory that he was not guilty and never admitted committing the murder. The comment was not error, let alone fundamental error.
 

 The third comment raised by Rao as an impermissible comment on silence involves the prosecutor’s reference to the taped conversation between Rao and his mother
 
 after
 
 his arrest. Commenting on the substance of the conversation, the prosecutor asked:
 

 Did he ever complain to his mother, mom, I don’t know what I’m doing here, I have no idea what I’m doing here, did
 
 
 *45
 

 he ever?
 
 Did he ever tell his mother what he was charged with? I’m being held no bond, that’s all he ever said.
 
 He never told his mom what he was charged with, never said he did not do it
 
 .... I’d like you to look at what he never did say; mom, I didn’t do it, don’t know what the heck I’m doing here, what am I doing on this charge of no bond, mom?
 

 Rao attempts to analogize this post-arrest comment to ones made in
 
 Cowan v. State,
 
 3 So.3d 446 (Fla. 4th DCA 2009), which we held constituted an improper comment on defendant’s silence. In
 
 Cowan,
 
 codefen-dants were placed in a police vehicle after their arrest on a burglary charge. While in the vehicle, the codefendant could be heard saying: “Damn, you think they caught us for the home invasion, home burglary?” and “Hey, we did not leave anything in there?” The defendant testified at trial, and the prosecutor confronted him with his codefendant’s statements. The defendant claimed that he had said nothing to his codefendant in the vehicle. During cross-examination, the prosecutor asked the defendant,
 
 over objection,
 
 why he hadn’t said, “What are you talking about, what burglary?” or “I don’t know what you’re talking about.”
 

 On appeal, Cowan argued that the prosecutor impermissibly commented on his silence by asking those questions. The appellate court agreed and reversed, ruling:
 

 We see no significance in the fact that defendant’s silence was not a response to police interrogation. Neither was defendant’s silence in
 
 Hoggins
 
 a response to police interrogation, arising instead from accusations by the victim of the crime. Yet
 
 Hoggins
 
 emphasized that the state constitutional right against self-incrimination after arrest “extend[s] to
 
 all evidence and argument, including impeachment evidence and argument,
 
 that was fairly susceptible of being interpreted by the jury as a comment on silence.” [e.s.] 718 So.2d at 769. Similarly, in
 
 Hosper v. State,
 
 513 So.2d 234 (Fla. 3d DCA 1987) — cited with approval in
 
 Hoggins,
 
 718 So.2d at 769—the Third District held: “The prosecution is not permitted to comment upon a defendant’s failure
 
 to offer
 
 [e.s.] an exculpatory statement prior to trial, since this would amount to a comment upon the defendant’s right to remain silent.” 513 So.2d at 235;
 
 see also Weiss v. State,
 
 341 So.2d 528 (Fla. 3d DCA 1977) (same holding as regards questioning of defendant concerning his failure to give exculpatory explanation at any time prior to his trial testimony). The plain meaning of the phrase used in
 
 Hoggins-11
 
 all evidence and argument” — includes circumstances other than police interrogation. Hence, the Florida Constitutional right against self-incrimination does not require police interrogation to trigger its protection; it shields all post-arrest silence with or without police interrogation. The accused does not need any contextual element of police questioning to bar any use at trial of his post-arrest silence.
 
 Hoggins,
 
 718 So.2d. at 771.
 

 Id.
 
 at 450 (footnote omitted). Our court held that the prosecutor’s questions constituted reversible error as they commented on the defendant’s post-arrest silence.
 

 The
 
 Cowan
 
 analysis applies in this case. The prosecutor’s comments on the defendant’s failure to explain his circumstances to his mother constituted an impermissible comment on silence. Nevertheless, the defense did not object to the comments. A comment on the right of silence in closing argument, while constitutional error, does not constitute fundamental error, which goes to the heart of the case or the merits of the cause of action.
 
 *46
 

 See Gutierrez v. State,
 
 731 So.2d 94, 95 (Fla. 4th DCA 1999). Moreover, even if properly preserved, we would conclude that the error was harmless beyond a reasonable doubt under the standard announced in
 
 DiGuilio.
 

 For the foregoing reasons, we affirm the conviction and sentence.
 

 POLEN and FARMER, JJ., concur.
 

 [1]
 

 . Although the trial transcript states “touched the body,” we suspect that this may be a transcription error and that the witness really stated "torched the body.”