DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**ANTHONY FERRARI,**
Appellant,

v.

**STATE OF FLORIDA,**
Appellee.

No. 4D14-464

[November 21, 2018]

Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; Ilona M. Holmes, Judge; L.T. Case No. 05015875CF10B.

Carey Haughwout, Public Defender, and Paul Edward Petillo, Assistant Public Defender, West Palm Beach, for appellant.

Pamela Jo Bondi, Attorney General, Tallahassee, and Melanie Dale Surber, Assistant Attorney General, West Palm Beach, for appellee.

***ON MOTION FOR REHEARING***

WARNER, J.

We grant the State's motion for rehearing, vacate our prior opinion, and substitute the following in its place.

In this appeal from his conviction for first degree murder and conspiracy to commit first degree murder, appellant raises multiple issues. We find two require reversal. First, the trial court denied appellant's motion to suppress historical cell-site location information (CSLI). In *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018), the United States Supreme Court held that accessing historical cell phone location information constitutes a search under the Fourth Amendment requiring a warrant and probable cause. Here, because the state acquired the CSLI without a warrant issued on probable cause, the court erred in denying the motion to suppress. Second, the court held that a mid-trial revelation of discovery that the State failed to disclose did not amount to a

*Richardson*[1] violation.  We hold that the State's failure to comply with its obligations under Florida Rule of Criminal Procedure 3.220, by neglecting to disclose the substance of a codefendant's statements as well as the existence of exculpatory statements by another witness, constituted a discovery violation.  On these grounds we reverse and remand for a new trial.

In 2005, the State charged appellant Anthony Ferrari, along with his codefendants Anthony Moscatiello and James Fiorillo, with the 2001 murder of Gus Boulis.  Fiorillo pled to the charges in 2012, and a trial involving Moscatiello and Ferrari commenced in 2013.  Moscatiello's attorney became ill during trial, and his trial was severed.  Trial continued against Ferrari.  Moscatiello was later tried, convicted, and sentenced upon the same essential testimony as was presented in the trial of Ferrari. Moscatiello appealed, and this court reversed his conviction for a new trial. *Moscatiello v. State*, 43 Fla. L. Weekly D1257 (Fla. 4th DCA June 6, 2018). In our opinion, we extensively recited the facts, which are the essential facts of this appeal as well.  We therefore repeat those facts for this opinion. We also add facts specifically relevant to Ferrari's trial.  Furthermore, we will discuss additional facts within the issues to which they are relevant.

**The Murder**

On February 6, 2001, Gus Boulis, a successful businessman, left his office in Broward County around 9 p.m. As he was heading south on Miami Road, a car stopped in front of him.  Boulis stopped his vehicle, and another car pulled in behind Boulis so that he was boxed in.  An innocent bystander was in a third car that stopped behind the first two cars.  A red Jetta pulled up behind the bystander's car.  While they were all stopped in a row, a black Mustang came from the opposite direction, and pulled up next to Boulis's vehicle. Someone in the Mustang fired several shots, killing Boulis. After the shooting, the bystander noticed that the red Jetta behind him drove off the road around him, and then took off. Later, he saw the red Jetta circling the block, perhaps looking for him.  The bystander memorized the partial tag number of the temporary tag on the Mustang and, when he got home, called 911.  Testimony revealed that both the Mustang and the Jetta were owned by Anthony "Little Tony" Ferrari, [the appellant] in this case.

---

[1]  *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).

The next day Dwayne Nicholson, an employee [or contractor] of Ferrari, called to report his knowledge about the murder. Eventually, he gave several statements implicating both Ferrari and Anthony "Big Tony" Moscatiello (appellant) in the murder. Thus, from 2001, the authorities knew of evidence connecting appellant to the murder. It took an additional four years for them to gather all the evidence and indict [Moscatiello], along with Ferrari and James Fiorillo, another employee of Ferrari, for the murder.

The State's theory of the case was that Moscatiello and Ferrari were hired by Adam Kidan to protect him from Boulis, from whom Kidan had purchased a business. For reasons somewhat unclear, Moscatiello determined that Boulis needed to be killed so that Moscatiello and Ferrari would not lose the protection payments from Kidan. The complicated story commences with the sale of the business from Boulis to Kidan. While there was some documentary evidence supporting meetings and payments, the direct testimony linking Moscatiello [and Ferrari] to the crime all came from witnesses each of whom received substantial benefits for their testimony.

## The Prelude to the Murder

The victim, Gus Boulis, had become successful as the owner of Miami Subs sandwich shops before founding SunCruz Casinos, a fleet of gambling casino boats. Eventually, the Attorney General's office advised Boulis that he had to sell SunCruz because he wasn't an American citizen when he started the business. As a result, Boulis sold the business to Adam Kidan and Jack Abramoff. Boulis received $23 million in cash and was supposed to get another $20 million, which he never received. The business relationship between Boulis and Kidan soured. Kidan was afraid that Boulis might harm him in retaliation for lack of payment, so he reached out to his connections in New York, and asked Moscatiello to assist him. Kidan wanted the word out that he, Kidan, had "connections." Moscatiello introduced Kidan to Ferrari in Miami to provide security or protection. Ferrari bragged to people that he was John Gotti's nephew and head of the Gambino family in Florida.[1] For this protection, Kidan entered into a deal with Moscatiello for Moscatiello to be a "consultant" supplying beverages and paper goods for the

gambling casino boat. Through Ferrari's business in Miami, Ferrari would arrange for Kidan's protection. Kidan paid Moscatiello monthly for the protection.

In November 2000, Moscatiello flew to Miami. Ferrari brought along Dwayne Nicholson and several other bodyguards as security to pick up Moscatiello from the airport. Ferrari, Moscatiello, and Nicholson rode in one vehicle, while the rest of the security team rode in others. While they were driving to a hotel, Nicholson testified that Ferrari and Moscatiello discussed the fact that they did not want to pay Boulis the extra money he was owed on the sale of Sun Cruz. Ferrari responded that Nicholson would take care of Boulis. Moscatiello turned to Nicholson and said, "Now, you know what he means . . . we need Gus killed. Are you able to do it?" Nicholson did not say anything, because he thought he would be killed if he didn't agree. Ferrari had previously asked him whether he would kill Boulis, and Nicholson had declined.

The next day, Ferrari and Nicholson picked up Moscatiello and drove to the SunCruz office to show Nicholson the office, the ships, and the vehicle that Boulis drove. Moscatiello said that Boulis had to be taken care of prior to an upcoming court date. After Moscatiello was dropped off, Nicholson again complained to Ferrari that he wasn't going to kill Boulis. Ferrari told him just to surveil Boulis, and he would figure out later what to do.

Meanwhile, Kidan became frustrated with his relationship with Ferrari and his protection service. While Kidan was out of the country, he terminated his relationship with Ferrari. That same day, Boulis was killed.

**The Murder and its Aftermath**

James Fiorillo was another assistant to Ferrari, who was more like a son to him. Fiorillo did multiple errands for Ferrari and other tasks. On the day of the murder, Fiorillo arrived at Ferrari's home in a black Mustang belonging to Ferrari, which Fiorillo frequently drove. He then switched vehicles with Ferrari. Ferrari drove away, and Ferrari's girlfriend followed in his red Jetta. Fiorillo also had access to several of Ferrari's phones.

4

Although the innocent bystander witnessed the murder, he could not identify anyone in any of the vehicles. The partial license number he obtained did match up to the black Mustang. Thus, no independent witness testified as to who was present at the scene. However, Fiorillo knew about the murder and what occurred.

Fiorillo went to Ferrari's home after the murder. Ferrari gave him a bag containing a gun, which Fiorillo disposed of. Fiorillo also drove the Mustang to a repair shop. The next day, Fiorillo met with Ferrari and Moscatiello at a hotel. Moscatiello told Fiorillo to drive to New York and to report the Mustang as stolen, which he did. In New York, Fiorillo met with Moscatiello. When Moscatiello asked for the details of the events leading up to the murder and the murder itself, Moscatiello became very angry. He told Fiorillo to stay in New York, and Ferrari's girlfriend allowed Fiorillo to stay with her for a week there, after which he stayed in a hotel. Fiorillo worked for Moscatiello for a while and then returned to Florida sometime in April. Ultimately, Fiorillo was arrested and charged with conspiracy to commit murder for which the State was seeking the death penalty, as the State originally believed that he was the shooter. He reached a plea deal in which he agreed to testify against Moscatiello and Ferrari in exchange for a six-year prison sentence.

When Kidan returned to Florida after the murder, he met Moscatiello in his hotel room and asked if he knew what happened. Moscatiello said, "Yes, it was very unfortunate, it wasn't supposed to happen that way." Moscatiello admitted that it was his decision. He explained that the plan was to kidnap Boulis, kill him, and bury his body on a farm where he would not be found for years. Kidan asked who was involved, and Moscatiello told him that the shooter came down from New York and went home on Amtrak. Fiorillo drove the car, and Ferrari was in another car. Kidan knew that a Mustang had been used in the murder and he knew Fiorillo had one, so he asked Moscatiello if that was the same car. Moscatiello told him it was the same Mustang. Kidan complained that that car should not have been used.

Kidan had made significant payments to both Moscatiello and Ferrari for protection. In June 2001, Kidan made a last

payment, and then SunCruz went into bankruptcy. Later, Kidan was being investigated by the FBI in connection with the murder. In April 2004, Kidan met Moscatiello in New York and explained that he was being investigated by the government. He told Moscatiello that he thought someone was cooperating with the government. Kidan asked about the shooter, and Moscatiello told him that the shooter had died after he was shot in a deli in Boca Raton. Kidan googled the incident and discovered that the man who had been shot was named John Gurino.[2]

Kidan was convicted of wire fraud in connection with the SunCruz purchase and sale and went to prison in 2006. He contacted law enforcement about cooperating in the Boulis murder investigation in 2006, and his original sentence of five years was cut to twenty-seven months. He testified against [Ferrari] at the trial, giving details of the SunCruz sale and Moscatiello's [and Ferrari's] activities.

## Nicholson Contacts Law Enforcement and Investigation Commences

The day after the murder, Nicholson was watching the news and saw that Gus Boulis had been killed, and police were looking for a black Mustang. Nicholson knew that Fiorillo usually drove the Mustang. He was afraid that he might be killed next, so he called Crime Stoppers. He was put in touch with law enforcement, and gave a statement to Fort Lauderdale police on February 9, 2001.

Police asked Nicholson to call Ferrari by phone, which they attempted to record without success. Then police asked him to meet with Ferrari while wear[ing] a listening device hidden inside a beeper. When Nicholson met with Ferrari, Ferrari grabbed the beeper and asked about it. Nicholson told him his girlfriend had given it to him to keep track of him.

Thereafter, Nicholson tried to avoid Ferrari, although he was still owed money for his work for Ferrari. Around Memorial Day, another of Ferrari's assistants, Ben Potter, came by Nicholson's house to tell him that Ferrari wanted to speak to him. Nicholson, Fiorillo, and Potter drove to Ferrari's mother's house in Venice, Florida. On the way, Fiorillo asked Nicholson if he (Nicholson) was going to kill him (Fiorillo).

6

Nicholson responded that he thought Fiorillo and Potter were going to kill him (Nicholson). At Ferrari's mother's home, Ferrari told Fiorillo that he was "running his mouth" too much, referring to Fiorillo's recent trip to New York.

Sometime after Memorial Day, Nicholson confronted Ferrari about money Ferrari still owed him for his services. Ferrari called Moscatiello about the money, and put the call on speaker phone. When Ferrari asked him about the money, Moscatiello answered, "F*ck those n****rs, just kill them." Nicholson never got his money.

Nicholson was never charged with any crime as a result of his interactions with Ferrari and Moscatiello. He received a six figure Crime Stopper's reward for his assistance. He also testified against Moscatiello.

**The State's Other Evidence [ ]**

In 2007, several years after Moscatiello and Ferrari had been charged, Joseph Marley wrote a letter to the state attorney offering information regarding Moscatiello. Marley had been in custody in the county jail for over two years on a drug trafficking charge. His crimes could have resulted in a seventy-five year sentence. Looking for leniency, he negotiated a plea in exchange for his information and testimony, which allowed him to be sentenced to time served and to be released upon pleading to the charges.

Marley was a limousine driver in New York, and would hang out at clubs owned by John Gotti. He would see Moscatiello at those clubs. Marley used to work for Anthony and Michael Gurino, who were cousins of John Gurino, who became the suspected gunman in the Boulis murder. About six weeks after the Boulis murder, Marley ran into John Gurino at the Coconut Creek casino. Gurino kissed him and said he (Gurino) had a new nickname, "SunCruz Kid." At first Marley didn't know what he was talking about, and Gurino said "Don't you read the papers?" Then it dawned on Marley that he was referring to the murder of Gus Boulis, which he had seen reports of on television. Marley asked, "Was that you?" Gurino looked at him with a smirk, which Marley interpreted as a "yeah." And, Marley said, "What were you doing, shaking him down?" Gurino laughed and said,

"Something like that. I got the work from Moscatiello."  In 2003, John Gurino was himself murdered in a Boca Raton deli.

The State also read the testimony of Nick DiMaggio, who was in a federal witness protection program and unavailable.  He had testified in prior proceedings involving the Boulis murder.  DiMaggio was a lifetime criminal and had known Moscatiello his whole life.  He also knew John Gurino, who was his best friend.  In 2000 or 2001, Moscatiello had asked DiMaggio to stop by his house in New York.  During their meeting, Moscatiello offered him $100,000 to go to Florida and kill Gus Boulis.  Moscatiello explained that Boulis was making a lot of problems with a gambling business and a lot of money was at stake.  DiMaggio was insulted because he was being asked to kill someone for money rather than for "principle."  He left the meeting and told Gurino about the offer.  Later, he became aware that Boulis was in fact killed when he received a news article about the murder, sent to him by Gurino.  A few weeks later, DiMaggio spoke with Moscatiello in New York, and Moscatiello told him "he took care of it."  However, Gurino never told DiMaggio that he had shot Boulis, and DiMaggio would have been shocked if he did, as Gurino lived by the same principles as DiMaggio.  DiMaggio testified as part of a plea negotiation, which required him to testify in this case and others.  For his testimony in various proceedings, including this one, the government did not charge him with multiple crimes, which included murders.  He was held in custody for nearly seven years, but at sentencing, he received a sentence of only a year.  He was released to the witness protection program.

Finally, Paul Brandreth, a convicted felon in federal prison for a drug crime and for second degree murder in a state prosecution, testified that he was approached by Ferrari to kill three people, including a black man (Nicholson) and a woman (Ferrari's girlfriend), both of whom lived in South Florida, and a person in a hotel in Yonkers (Fiorillo), for whom law enforcement was looking.  Ferrari needed Brandreth to get to Fiorillo before the investigators did.  Brandreth travelled to New York and stayed with Fiorillo, ostensibly for Fiorillo's protection.  When Brandreth arrived, he was picked up at the airport by Moscatiello.  Moscatiello said to him, "so you're the one, kid, huh?  You're the one, nothing but a f*cking hat trick

for you. Nothing but a Trifecta." Brandreth knew he was referring to the three people Brandreth was supposed to "whack." He asked Moscatiello for his money. Moscatiello replied, "What do you mean? I thought the other Tony took care of you." Brandreth told him he needed a "paintbrush" which was code for a gun. Moscatiello said that he didn't have a gun, but he had "a shotgun from a fed job he did one time." Moscatiello told him to wait for a phone call, but not to kill Fiorillo at the hotel because he owned the hotel. Brandreth stayed with Fiorillo, but never got a phone call or gun. He returned to Florida. In 2012, he was visited by two officers while he was in prison for murder and federal charges. In his state murder case, prosecutors agreed to have his state sentence terminate when his federal sentence terminated in exchange for his testimony in this case, significantly reducing his prison time.

_____

[1] John Gotti was the boss of the Gambino crime family in New York.

[2] This was later confirmed, through testimony at trial, from the man who shot Gurino at the deli.

*Id.* at *1-5.

### Evidence at Ferrari's Trial of His Cars, Cell Phones, and Guns

The State presented evidence that Ferrari owned many different types of cell phones, including Nextel phones that could be used like walkie-talkies. Nicholson testified that Ferrari used at least four different cell phones. Other people in Ferrari's orbit, including Nicholson and Fiorillo, used the phones. Ferrari also had a lot of cars, and Ferrari let Fiorillo drive his Ford Mustang. Ferrari parked the cars at the parking garage by his office. In January 2001, Ferrari got a case of handguns from Nicholson, including a .380 handgun that was the same type of gun used to kill Boulis. Fiorillo and Ferrari used the guns at a shooting range. Nicholson also testified that before Boulis died, Kidan gave Ferrari a gun.

A special agent for the Secret Service and a member of the FBI violent crimes task force testified regarding telephone calls made from Ferrari's cell phones. Cell phones must be in communication with a tower to receive phone calls or messages and to transfer data. Phone companies record people's historical cell-site location information ("CSLI"), which can be imported onto a mapping program to show the location of the towers that received the phone's data at certain times. The agent analyzed the CSLI

from the night of the murder for two of Ferrari's cell phones, and he put the technical data on a map. On the night of the murder, the phones were used near Boulis's office, and they did not move location from 6:40 p.m. to 9:19 p.m. Just after 9:00 p.m., the phones made a series of calls to each other, and the phones began moving south and east towards Miami Beach, in different routes but close together.

## Ferrari's Defense

Ferrari testified at his trial. Ferrari met Nicholson through business, and he had known Moscatiello for a long time. He knew Adam Kidan, "the devil himself," but not Joseph Marley, John Gurino, or Nick DiMaggio. In September 2000, Moscatiello told Ferrari that he was going to do business with Kidan, and Moscatiello wanted Ferrari to find a warehouse in Florida for Moscatiello's wine business. Moscatiello told Ferrari that Kidan wanted to hire security to watch the Sun Cruz boats, and Ferrari reached out to Darryl Wysinger. Beginning in December 2000, Kidan began paying Ferrari $25,000 a month for security, even though Ferrari admitted that he knew nothing about running a security company. Ferrari obtained advice from an outside security consultant, Mark Martin, who specialized in covert security cameras and listening devices. Kidan hired Martin to install listening equipment in Boulis's offices.

Ferrari testified that he was watching his daughter when Boulis died, and a friend of his was at his house. On that night, Fiorillo came to Ferrari's condo after dark to pick up the Mustang. Fiorillo left, but he returned at about 12:30 a.m., hysterically crying and stating that he just killed Boulis. Nicholson arrived and told Fiorillo to keep his mouth shut, but Fiorillo confessed in front of another of Ferrari's friends. Ferrari never asked Nicholson or Fiorillo to kill Boulis. Also, he never asked Brandreth to kill Fiorillo. Ferrari testified that he did not confess to Kidan, and Kidan and Nicholson used Fiorillo, who had a drug habit, to kill Boulis. Ferrari further testified that Kidan was the "mastermind" behind the murder. He denied that Nicholson was in the vehicle in November when Moscatiello came to Florida. Nicholson was lying and was involved in the murder.

Ferrari had at least ten cars. As mentioned above, all of the cars were kept at the parking garage at Ferrari's office, and the keys were kept inside his office. Ferrari bought the Mustang for Fiorillo to drive because he did not want Fiorillo to drive his other cars. Ferrari admitted that he had three or four Nextel phones under his company's name, and he had three other phones under either a second company's name or his business associate's

10

name.  Ferrari testified that Fiorillo and Nicholson had access to his cars, phones, and offices.

Ferrari met Brandreth at the car repair shop that he used.  Although Ferrari admitted that he loaned Brandreth $1,100, Ferrari did not hire Brandreth to kill Fiorillo.  With respect to the meeting at his mother's house in Venice, Florida, Ferrari testified that he had Potter bring Nicholson and Fiorillo to his mother's house because Fiorillo told Nicholson how McDonald's makes its deposits, and Nicholson used that information to rob Ferrari's wife, a McDonald's manager.  Ferrari made additional, specific denials to the other claims raised by the State's witnesses.  On cross-examination, the prosecutor elicited over objection that Ferrari had not made any of these statements to investigators before his trial testimony.

After closing argument, the jury found Ferrari guilty of first degree murder and conspiracy to commit first degree murder.  The court sentenced Ferrari to life in prison without parole for the murder charge and to thirty consecutive years for conspiracy to commit murder.  Ferrari timely appeals.

**Analysis**

**I. Suppression of CSLI Data**

Ferrari challenges the denial of his motion to suppress the historical CSLI data from two of his cell phones, which showed their location on the night of the murder.  In 2001, the State, upon the request of the investigating detective, subpoenaed the records of one cell phone company for the historical CSLI on these two cell phones.  That company faxed the CSLI to the police without contesting the subpoena.  The FBI agent later testified about these subpoenaed records at trial.  Before requesting the CSLI from this company through the subpoena, another cell phone company had refused to provide similar records without a court order, and the court had issued an order requiring the production of the CSLI from that company.  Ferrari unsuccessfully moved to suppress the subpoenaed historical CSLI data.  Appellant challenges the denial of the suppression of the CSLI data obtained by subpoena, arguing that the State violated section 934.23, Florida Statutes, and the Fourth Amendment.

In *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018), the Supreme Court held that historical CSLI data is protected by the Fourth Amendment, and thus, the government's acquisition of such data constitutes a search which requires a warrant supported by probable

cause. The Supreme Court's opinion is binding upon Florida courts under article I, section 12 of the Florida Constitution, and an appellate court applies the law in effect at the time of its decision. *See State v. Glatzmayer,* 789 So. 2d 297, 303 n.10 (Fla. 2001). Therefore, the acquisition of the CSLI records without a warrant based upon probable cause violated Ferrari's Fourth Amendment rights.

The State, however, contends that even if CSLI data is protected under the Fourth Amendment, the investigator's acquisition of the data in this case should be protected by the "good faith" exception to the exclusionary rule. We disagree.

The "good faith" exception avoids the exclusion of the results of a warrantless search where the police conduct an objectively reasonable search based upon binding decisional law, *see Davis v. United States,* 564 U.S. 229 (2011), or in reasonable reliance on an applicable statute, even if that statute is later held to be unconstitutional, *see Illinois v. Krull,* 480 U.S. 340 (1987). In this case, the search occurred in 2001. At that time, no binding decisional law existed determining that CSLI data was not within Fourth Amendment protection and thus exempt from the warrant requirement. In fact, CSLI data is never mentioned in reported decisions in that time period. When denying Ferrari's motion to suppress, the trial court relied on our decision in *Mitchell v. State,* 25 So. 3d 632, 635 (Fla. 4th DCA 2009), which held that a person has no expectation of privacy in historical CSLI. However, that decision was several years after the search, and even in that opinion, we noted that the case law concerning historical CSLI was unsettled. *Id.* at 634. Thus, the detective had no case law on which to rely in his decision not to secure a warrant or court order for the historical CSLI. Instead, the detective obtained the information by way of subpoena. In fact, the detective did not even cite any statute in the request for issuance of the subpoena.

The trial court found that section 934.23(1)[2] required a court order or a warrant to obtain electronic communication information, and it was undisputed that a warrant had not been obtained. While the court cited section 934.23(1) in its order denying the motion to suppress, Ferrari cited

---

[2] Section 934.23(1), Florida Statutes (2001) (emphasis added), provides:

> (1) An investigative or law enforcement officer may require the disclosure by a provider of electronic communication service of the contents of an electronic communication that has been in electronic storage in an electronic communications system for 180 days or less only **pursuant to a warrant issued by the judge of a court of competent jurisdiction.**

to section 934.23(4)(b) in his motion. Section 934.23(4)(b), Florida Statutes (2001), provides that information pertaining to a subscriber, not including the contents of an electronic communication, must be obtained by warrant, court order, or consent of the subscriber.[3]

We need not determine which subsection applies, because the officer did not comply with either subsection and did not obtain a warrant or court order. Thus, he was not acting in reasonable reliance on a statute. In addition, the other carrier specifically told the officer that he needed a court order to secure the CSLI data, which order the officer obtained. This was before the officer requested a subpoena for the CSLI from the subject cell phone company. Given both the law enforcement officer's failure to follow the statute and the officer's knowledge of the other company's express objection to producing CSLI without a court order, the state cannot meet the good faith exception.

In *Tracey v. State*, 152 So. 3d 504, 525-26 (Fla. 2014), the Florida Supreme Court held that real time CSLI data was protected by the Fourth Amendment, and thus, its use by law enforcement constituted a search which required a warrant based upon probable cause. There, the detectives had obtained an order pursuant to section 934.33 authorizing a pen register, but then they used that order to obtain real time CSLI given off by the petitioner's cell phone. *Id.* at 507-09. Our supreme court rejected the application of the good faith exception to the exclusionary rule because there was no binding appellate precedent or court order on which law enforcement could objectively rely. *Id.* at 526. Similarly, the Supreme Court held in *Carpenter* that an order authorizing acquisition of historical CSLI issued pursuant to the federal Stored Communications Act did not satisfy the Fourth Amendment because the order was based upon reasonable suspicion and not probable cause. 138 S. Ct. at 2221. The Supreme Court did not hold that the officers acted in good faith in using

---

[3] Section 934.23(4)(b)(1.)-(3.), Florida Statutes (2001), provides:
    A provider of electronic communication service or remote computing service shall disclose a record or other information pertaining to a subscriber to or customer of such service, not including the contents of communications covered by subsection (1) or subsection (2), to an investigative or law enforcement officer only when the investigative or law enforcement officer:
    1. Obtains a warrant issued by the judge of a court of competent jurisdiction;
    2. Obtains a court order for such disclosure under subsection (5); or
    3. Has the consent of the subscriber or customer to such disclosure.

the SCA. Indeed, the message of the Supreme Court is unmistakable to law enforcement: "Before compelling a wireless carrier to turn over a subscriber's CSLI, the Government's obligation is a familiar one—get a warrant." *Id.* In both these cases, the court did not apply the good faith exception where a court order was involved, albeit issued without probable cause. Where there is not even an attempt to obtain a court order, as required by statute, there is no good faith attempt to comply with the dictates of law and the Constitution.

For these reasons, we hold that under *Carpenter*, the historical CSLI data was protected by the Fourth Amendment. The acquisition of this data without a warrant based on probable cause constituted an illegal search pursuant to the Fourth Amendment. Further, the good faith exception to the exclusionary rule does not apply because the State was not relying on binding precedent or clearly applicable statutes in obtaining the data.

## II. Richardson Discovery Issue

Ferrari challenges the trial court's mid-trial denial of his *Richardson* challenge. During the cross-examination of Nicholson, the defense discovered the existence of multiple tapes and statements by Fiorillo and others, which were referred to aptly by the court as "bombshell" discovery. Because we conclude that a *Richardson* violation occurred and the revelation of the discovery could have changed the strategy of the defense, we are compelled to reverse.

In response to a question in cross-examination, Nicholson mentioned that he had worn a wire during one of his conversations with Fiorillo. This revelation surprised both the prosecutor and defense. The court excused the jury and began to conduct a *Richardson* hearing. Nicholson testified that the police wired his van, and the police recorded his conversations with Fiorillo on only one occasion. The court recessed for the evening and told the prosecutor that he needed to investigate if there were any reports about the recordings.

When the court reconvened the next day, the defense attorneys informed the court that they had called Dohn Williams, Fiorillo's former attorney, who told them that he had ordered "all of the tapes of all of the statements" from the Ft. Lauderdale Police Department five or six years before the trial. The tapes were still in Williams's office, and defense attorneys brought about nine of the seventy-five to eighty tapes to court.

Several of the tapes involved Nicholson's contacts with Fiorillo, and the defense attorney stated that there was "not a single police report that is

filed in this case that would have even alerted us to that." There were at least one or two tapes from Nicholson's conversation with Fiorillo in August 2001. The prosecutor reported that a detective wired Nicholson's van, but the detective never authored a report about the wiring because he believed that it was covered in Nicholson's statements. The prosecutor did not see anything about it in either Nicholson's statements or the detective's reports.

Ferrari's attorney asked for the court to un-sequester the jury so that he could listen to the tapes with Ferrari. He stated that Williams did not bring up the tapes when he deposed Nicholson, and Williams "must have forgotten about them somehow." The attorney said that in one of the tapes, Nicholson told Fiorillo that "they think I'm involved." Although this may have been a comment to induce Fiorillo to incriminate himself, Nicholson's statement would have been helpful to impeach Nicholson. The court required the attorney to continue his cross-examination of Nicholson, after which the court would adjourn for a day and a half for the attorneys to listen to the tapes.

At the renewed hearing, defense counsel produced five of thirteen tapes which he had the court reporter transcribe and several un-transcribed tapes. One of the un-transcribed tapes consisted of a statement by a Curtis Jackson, who said that he came down from Detroit to help kill Boulis. Jackson said a man in Gainesville paid to have Boulis killed. On another tape, Orlando Torrens, who worked for Fiorillo, said that Fiorillo confessed to him that he killed Boulis. Counsel argued that there was a *Richardson* violation and asked the court to grant a continuance so that he could complete discovery. Ferrari's attorney wished to depose Orlando Torrens and to re-depose Fiorillo, and he stated that he thought they had "gone from a potential discovery violation to a Brady violation, and maybe both."

During the hearing, the State produced a letter from February 22, 2006, in which Williams wrote to one of the detectives that he was sending him seventy-five blank cassette tapes "so that [he] might obtain copies of the tape-recorded statements set forth in the attached evidence property forms that were supplied in discovery." The prosecutor argued the letter proved Williams received the police property forms in discovery from the State, which indicated that there were seventy-five different tapes, and the property receipts listed Torrens's "sworn, taped statement." On the letter, Williams cc'd Moscatiello's attorney and Ferrari's prior attorney. Because defense counsel had the property receipts and Williams's letter, the State argued there was no discovery violation. In addition, the prosecutor produced a 2009 supplemental discovery regarding tapes of jail cell

conversations of Ferrari and Fiorillo, which included an agreement that one copy of the tapes would be supplied to Williams who would copy it for the other defense attorneys.

The trial court found that no *Richardson* violation had occurred because Williams was the "point person" for distributing discovery to the other defense attorneys. The court relied on the 2009 discovery to establish this agreement. The court assumed Williams did not tell the attorneys about the tapes because "there was nothing worth while or evidentiary on these tapes." Because no one contested that Williams was the "lead defense in getting the tapes and DVDs" in 2009, and because Williams had the other tapes listed in the police property receipt from 2006 to 2013, the court found no discovery violation.

Defense counsel, however, did object to the court's characterization that Williams was authorized to act for them as to the distribution of the 2006 tape request. They also requested a mistrial and/or continuance to allow them to listen to all the tapes with their clients. Defense counsel then proffered Williams's testimony that there was no agreement between him and other defense counsel with respect to the tapes received in 2006, and he did not have the responsibility to notify anyone about the tapes. The court denied all motions, finding that Williams put the attorneys of record on notice of the existence of the tapes when he requested them.

When a trial court learns of a possible discovery violation, "the court must conduct a *Richardson* hearing to inquire about the circumstances surrounding" the State's discovery violation, and it must ascertain the possible prejudice to the defendant. *Cuminotto v. State*, 101 So. 3d 930, 936 (Fla. 4th DCA 2012) (citing *Jones v. State*, 32 So. 3d 706, 710 (Fla. 4th DCA 2010)). If the court finds a discovery violation, it must determine if the violation was: (1) inadvertent or willful; (2) trivial or substantial; and (3) whether it resulted in prejudice or harm to the defendant. *Richardson v. State*, 246 So. 2d 771, 774-45 (Fla. 1971).

The parties dispute the standard of review for the trial court's findings. The State contends that the trial court's ruling is reviewed for an abuse of discretion, while Ferrari contends that where the finding is based upon facts or an erroneous interpretation of the law, the review should be de novo. *Richardson*'s three prongs "are reviewed for an abuse of discretion, but this discretion can be exercised only following a proper inquiry." *Goldsmith v. State*, 182 So. 3d 824, 827 (Fla. 4th DCA 2016) (quoting *Brown v. State*, 165 So. 3d 726, 729 (Fla. 4th DCA 2015)). In *Curry v. State,* 1 So. 3d 394, 398 (Fla. 1st DCA 2009), the court noted that various

issues are presented as to whether there was a discovery violation, necessitating different standards:

> The threshold question in all of these cases is whether there was a discovery violation. This might be a factual issue, for example if the dispute is whether the evidence was or was not disclosed. In that event, a hearing would be needed to resolve the dispute. It is possible that the issue might present only a question of law, for example, if the alleged violation turns on the interpretation of a rule. In that case, the need for a hearing would depend on the resolution of the issue. If the court correctly determined that there was no violation, there would be no need for a hearing. But if a discovery violation has occurred, the trial court is required by law to grant a *Richardson* hearing. The court cannot simply exercise its discretion to deny a hearing.

If a court incorrectly concluded there was no violation and failed to address each of *Richardson's* three prongs, the *Richardson* hearing was inadequate. *Goldsmith*, 182 So. 3d at 827. A court's finding that there was no violation must be supported by the record. *Knight v. State*, 76 So. 3d 879, 888 (Fla. 2011). To the extent the trial court's rulings involve interpretation of the rules, we review those de novo. To the extent that the court's rulings rely on a factual predicate, we review the record for competent substantial evidence to support the trial court's findings.

The discovery rules facilitate truth-finding and "avoid trial by surprise or ambush." *Scipio v. State*, 928 So. 2d 1138, 1144 (Fla. 2006). "Because full and fair discovery is essential to these important goals, we have repeatedly emphasized not only compliance with the technical provisions of the discovery rules, but also adherence to the purpose and spirit of those rules in both the criminal and civil context." *Id.*

The State's obligations in the production of discovery are extensive. Florida Rule of Criminal Procedure 3.220(b)(1)(A) requires the prosecutor to disclose "the names and addresses of all persons known to the prosecutor to have information that may be relevant to any offense charged or any defense thereto . . . ;" any written or recorded statements of its listed witnesses; and "any written or recorded statements and the substance of any oral statements made by a codefendant." Fla. R. Crim. P. 3.220(b)(1)(B), (b)(1)(D). The prosecutor must also disclose any "material information" that negates the defendant's guilt. Fla. R. Crim. P. 3.220(b)(4); *see Perdomo v. State*, 565 So. 2d 1375, 1376 (Fla. 2d DCA 1990) (finding evidence of "debatable exculpatory value" should be

disclosed, and thus, the State should have disclosed its possession of the defendant's clothes even though the State believed that the evidence had been stolen). The State must either be aware of the evidence, must possess the evidence, or must be "charged with constructive knowledge and possession of evidence withheld by state agents, including law enforcement officers." Fla. R. Crim. P. 3.220(b)(1); *see Jones v. State*, 32 So. 3d 706, 708-11 (Fla. 4th DCA 2010) (finding that although the prosecutor disclosed the defendant's threat towards the victim as soon as he learned of it, the prosecutor could have been charged with the knowledge of the defendant's statement because a deputy knew about the threat, and the defendant was procedurally prejudiced by the court's failure to conduct an adequate *Richardson* hearing to determine if the discovery violation prejudiced the defendant's ability to prepare for trial). Here, the State is charged with the knowledge of the tapes in the possession of the police.

In *Blatch v. State*, 495 So. 2d 1203, 1204 (Fla. 4th DCA 1986) (quoting *Odoms v. State*, 431 So. 2d 1041 (Fla. 4th DCA 1983)) (emphasis in original), we explained that "[t]he state has an affirmative duty, upon demand, to furnish *full* discovery" to the defense. There, the State had disclosed exculpatory statements of the defendant, but it had failed to provide an inculpatory statement made by the defendant that it sought to use at trial. *Id.* In reversing, this Court held that the State must provide the defense with the substance of a defendant's statements, and it cannot merely supply the name of a person to whom the statement may have been made:

> The trial court ruled that the defense, having been advised of the names of the officers, had an obligation to depose them. *This is not the law. See Lavigne v. State*, 349 So. 2d 178 (Fla. 1st DCA 1977). The law requires the disclosure of the substance of any statements made and known by the state to exist as well as the identity of the person to whom it was made.

*Id.* (emphasis added); *see also Kucher v. State*, 758 So. 2d 1165, 1166 (Fla. 2d DCA 2000) (finding the State committed a discovery violation by failing to provide defense with oral statement of defendant, even though the State's discovery notice had stated that there were statements by the defendant; "[t]he fact that defense counsel has been provided the witness's name and fails to depose the witness does not excuse prosecution's failure to inform the defense of a statement made by the defendant to which the witness will testify.").

The State had the obligation of providing to the defense the substance of any statements by a codefendant, as well as any exculpatory information. Fiorillo was a codefendant until 2012, at which point he accepted a plea deal. In its discovery responses, the State failed to provide the substance of Fiorillo's statements to Nicholson, and it never disclosed the statement by Fiorillo to Oscar Torrens in which Fiorillo confessed to murdering Boulis. The State also did not provide the exculpatory statement by Curtis Jackson. While statements between Nicholson and Fiorillo are mentioned in the property receipts from the Fort Lauderdale Police, the statement from Torrens in the property receipts does not reveal any substance or information that the statement contains a confession by a codefendant. Moreover, the property receipts listing all the statements and tapes never mention the Curtis Jackson statement at all. Neither Torrens nor Jackson are listed in the State's response to discovery.

The State failed to abide by its obligations under the rules in responding to discovery. Thus, it committed a discovery violation. The court, however, found no discovery violation, because the tapes of the statements were provided to the attorney for Fiorillo, a codefendant. Similar to what occurred in *Blatch,* this was insufficient to satisfy the State's obligation, as the substance of the statements was never revealed so that any defendant would know of the relevance or importance of the statements. Just as *Blatch* concluded that it was not the defendant's obligation to depose an officer to determine whether the defendant had made any statements, here, it was not the defendant's obligation to depose Torrens to discover Fiorillo's confession to the murder. It is the State's affirmative obligation to inform the defense of the substance of those statements. The State not only failed to comply with the technical requirements of the rules, it failed to adhere to their "purpose and spirit." *Scipio*, 928 So. 2d at 1144. The trial court erred as a matter of law in determining that the State sufficiently complied with its discovery obligations by providing copies of the voluminous statements in discovery where the State failed to provide the substance of those statements.[4]

We further conclude that the court's determination that no *Richardson* violation occurred because the tapes of the various statements were delivered to a codefendant's attorney is also not supported by the evidence

---

[4] This should not be an onerous obligation on the State. For instance, if there was a tape of a conversation between Nicholson and Fiorillo in which Fiorillo states that he killed Boulis, all that would be required is to note that fact. It could have identified the statement of Oscar Torrens that Fiorillo confessed to him that he killed Boulis.

presented. While there was an apparent agreement in 2009 that Fiorillo's attorney would receive the copy of jailhouse conversations to distribute to all of the defense attorneys, no such agreement was in place in 2006 when Fiorillo's attorney obtained the tapes from the police. Fiorillo's attorney was not acting as an agent for Ferrari.

"If the trial court incorrectly concludes that there was no discovery violation and fails to address each of the three prongs of *Richardson*, the *Richardson* hearing is inadequate." *Goldsmith*, 182 So. 3d at 827. However, a discovery violation is subject to a harmless error analysis. *Id.* at 828. A *Richardson* violation is harmless error "only if an appellate court can determine, beyond a reasonable doubt, that the defense was not procedurally prejudiced," and the State has the heavy burden to show the lack of procedural prejudice. *Id.* (citations omitted). The Florida Supreme Court held the following:

> In determining whether a *Richardson* violation is harmless, the appellate court must consider whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense. As used in this context, the defense is procedurally prejudiced if there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred. Trial preparation or strategy should be considered materially different if it reasonably could have benefited the defendant. . . . In other words, only if the appellate court can say beyond a reasonable doubt that the defense was not procedurally prejudiced by the discovery violation can the error be considered harmless.
>
> . . . .
>
> We recognize that in the vast majority of cases it will be readily apparent that the record is insufficient to support a finding of harmless error. . . .

*State v. Schopp*, 653 So. 2d 1016, 1020-21 (Fla. 1995).

On this record, it seems rather obvious that the discovery violation procedurally prejudiced Ferrari. Fiorillo testified that he was not at the murder scene, yet his multiple confessions to Nicholson and Torrens would have impeached his testimony and thus his credibility. It may also have changed defense counsel's strategy in having Ferrari testify because other evidence would have been available as to Fiorillo's involvement in

the murder.  Further, the fact that Curtis Jackson stated that he was hired by a person in Gainesville to murder Boulis could have revealed a whole different line of inquiry to support Ferrari's defense that he was not involved in the Boulis murder.  In any event, it is the State's burden to show that the defense was not prejudiced.  The State has not met its burden, and therefore, reversal is required.

## III.  Additional Issues

While we affirm on the remaining issues raised, we address briefly the claim that the prosecutor improperly commented, in cross-examination and in closing argument, on Ferrari's post-arrest silence.  During cross-examination, the prosecutor extensively questioned Ferrari about why he had not told anyone about Fiorillo's confession to him or Nicholson's involvement.  While defense counsel objected to the prosecutor's question about whether Ferrari ever had reported to any law enforcement, the trial court overruled the objection.  Furthermore, many of the prosecutor's questions were directed to the time directly after the murder.  During closing argument, the prosecutor commented twice on the fact Ferrari was making his claims of Fiorillo's confession twelve and a half years after the murder.  Counsel did object, but the court overruled his objection and denied the motion for mistrial.

Under Florida law, the State cannot "comment on a defendant's *postarrest* silence whether o[r] not the silence was induced by *Miranda* warnings."  *State v. Hoggins*, 718 So. 2d 761, 769 (Fla. 1988) (alteration added, emphasis added); *see Webb v. State*, 347 So. 2d 1054, 1056 (Fla. 4th DCA 1977).  However, the State may impeach a defendant with his or her pre-arrest, pre-*Miranda* silence.  *Hoggins*, 718 So. 2d at 770 ("Florida courts have found, consistent with the United States Supreme Court in *Jenkins* [*v. Anderson*, 447 U.S. 231 (1980)], that prearrest, pre-*Miranda* silence can be used to impeach a defendant.")  Therefore, the trial court did not err in allowing the prosecutor's questions to Ferrari about whether he had reported to the police that Fiorillo had confessed to the murder, as many of the questions were directed at pre-arrest, pre-*Miranda* silence.  Furthermore, we conclude that because of Ferrari's failure to object to most of the prosecutor's comments, particularly those which may have implicated post-arrest silence, the issue was not properly preserved.  *See Rao v. State*, 52 So. 3d 40 (Fla. 4th DCA 2010) (finding the prosecutor's comments on pre-arrest silence did not violate any constitutional rights; while the State did make an improper comment on the defendant's post-arrest right to remain silent, the defendant did not preserve the issue, and even if he did, any error was harmless beyond a reasonable doubt).

## Conclusion

The trial court erred in denying the motion to suppress the CSLI, as it was obtained without a warrant based upon probable cause. The court also erred in concluding that the State had not committed a *Richardson* discovery violation when it failed to provide the substance of a codefendant's statements and other exculpatory statements. Ferrari was prejudiced in his preparations for trial by these violations. Based upon the foregoing, we reverse the conviction of appellant and remand for a new trial.

GROSS and TAYLOR, JJ., concur.